**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
                              *Plaintiff,*

            and

EIGHTH DISTRICT ELECTRICAL
PENSION FUND; EIGHTH DISTRICT
ELECTRICAL BENEFIT FUND,
            *Claimants-Appellants,*

                v.

CAPITAL CONSULTANTS, LLC;
JEFFREY L. GRAYSON; BARCLAY L.
GRAYSON,
                              *Defendants.*

———————————————

THOMAS F. LENNON,
            *Receiver-Appellee.*

No. 03-35406

D.C. No.
CV-00-01290-KI

SECURITIES AND EXCHANGE
COMMISSION,
*Plaintiff,*

and

UNITED ASSOCIATION UNION LOCAL
290 PLUMBER, STEAMFITTER &
SHIPFITTER INDUSTRY PENSION
TRUST,
*Claimant-Appellant,*

v.

CAPITAL CONSULTANTS, LLC;
JEFFREY L. GRAYSON; BARCLAY L.
GRAYSON,
*Defendants.*

———————————————

THOMAS F. LENNON,
*Receiver-Appellee.*

No. 03-35407

D.C. No.
CV-00-01290-KI

ELAINE L. CHAO, Secretary of the
United States Department of
Labor,
                    *Plaintiff-Appellant,*

                    v.

CAPITAL CONSULTANTS, LLC;
JEFFREY L. GRAYSON; BARCLAY L.
GRAYSON,
                    *Defendants,*

                    and

THOMAS F. LENNON,
                    *Appellee.*

No. 03-35409

D.C. No.
CV-00-01291-KI

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff,*

and

OREGON LABORERS-EMPLOYERS
PENSION TRUST FUND; OREGON
LABORERS-EMPLOYERS HEALTH AND
WELFARE TRUST FUND; OREGON
LABORERS-EMPLOYERS DEFINED
CONTRIBUTION TRUST FUND AND
PLAN,

*Claimants-Appellants,*

v.

CAPITAL CONSULTANTS, LLC,

*Defendant-Appellee,*

and

JEFFREY L. GRAYSON; BARCLAY L.
GRAYSON,

*Defendants.*

THOMAS F. LENNON,

*Receiver-Appellee.*

No. 03-35412

D.C. No.
CV-00-01290-GMK

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
July 16, 2004—Portland, Oregon

Filed February 2, 2005

Before: Thomas M. Reavley,* William A. Fletcher, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Reavley;
Partial Concurrence and Partial Dissent by
Judge W. Fletcher

---

*The Honorable Thomas M. Reavley, Senior United States Circuit
Judge for the Fifth Circuit, sitting by designation.

**COUNSEL**

Christopher T. Carson, Portland, Oregon, for claimants-appellants, Eighth District Electrical Pension Fund, et al.

Barbee B. Lyon, Portland, Oregon, for claimant-appellant, United Association Union Local 290 Plumber, Steamfitter & Shipfitter Industry Pension Trust.

Stacey E. Elias, U.S. Dept. of Labor, Washington, D.C., for appellant, Elaine L. Chao, Secretary of Labor.

Harvey L. Rochman, Los Angeles, California, for appellants, Oregon Laborers-Employers Pension Trust Fund, et al.

Jeffrey R. Patterson, San Diego, California, for appellee, Thomas F. Lennon and defendants, Capital Consultants, LLC.

---

## OPINION

REAVLEY, Circuit Judge:

In these consolidated appeals, beneficiaries to a receivership complain about various aspects of the receiver's plan of distribution. The district court approved the plan of distribution, and we affirm.

## BACKGROUND

Capital Consultants, LLC (CCL),[1] was an Oregon investment management company that made investments for several hundred individuals, corporations, and employee benefit plans. The employee plans are retirement and other employee benefit plans subject to the Employee Retirement Income Security Act (ERISA).[2] Under investment advisory agreements and powers of attorney, CCL generally had broad discretion to invest funds on behalf of its clients in publicly-held securities as well as private assets such as real estate and private notes.

The Securities and Exchange Commission (SEC) and the United States Department of Labor (DOL) brought this suit to

---

[1] CCL previously did business as Capital Consultants, Inc. (CCI), and in some of the agreements discussed below CCI was the signing or designated party. Hereinafter, CCL refers to CCL and CCI.

[2] 29 U.S.C. §§ 1001-1461. Some of the ERISA plans were also multi-employer trust funds subject to the Labor Management Relations Act. *See* 29 U.S.C. § 186(c).

place CCL into receivership. These agencies claimed that CCL and its principals, Jeffrey and Barclay Grayson, had invested huge sums of client money in nearly worthless loans, and engaged in disloyal conduct and self-dealing. The briefs describe the CCL investments in private assets as "junk debt" and a Ponzi scheme.

The district court promptly placed CCL into receivership and appointed appellee Thomas Lennon as receiver, on September 21, 2000. On this date, CCL had approximately $1 billion in client funds under management. Early in the receivership, the receiver returned the publicly-held securities to each client on whose behalf CCL had purchased these securities. This action allowed the clients to see about $500 million in securities returned in relatively prompt fashion, so that the clients could manage these assets themselves or turn them over to new brokerage firms or investment managers. The receiver also returned about $20 million in cash held in clients' custodial accounts.[3] The publicly-held securities and cash were "traced" to each CCL client.

The assets remaining with the receiver were the bad loans and other relatively illiquid private assets CCL had purchased on behalf of various clients, and included private loans, private equities, and seven real estate assets. Unlike the public securities, the private assets of the receivership were not traced to individual clients, except that interim distributions of certain real estate parcels were distributed to specific clients. Clients who had invested in the real estate assets were given the option of receiving in-kind distributions. Four properties were distributed to clients through interim distributions.

---

[3]The $500 million and $20 million figures are based on a receiver affidavit in the record. The receiver's appellate briefs, however, state that as of the date the receivership was created, "CCL reported approximately $442 million invested in public equities and cash." This discrepancy may be due to timing or other reasons, but is irrelevant to our analysis.

In early 2002, the private loans and private equities were sold as a single unit to an investment bank for $60 million. The receiver also provided funds to the receivership corpus through litigation and mediation of claims against CCL, its principals, and other parties, and through the management and servicing of private investments prior to their sale. The corpus of the receivership also included the above-described real estate. In an August 2002 affidavit, the receiver stated that the receivership had marshaled assets valued at $259.5 million to cover claims including administrative claims, one secured claim, vendor claims, investor claims, and other claims. The largest group of claims are those of the CCL clients, the investor claims. According to the affidavit, the clients had invested approximately $480 million in CCL private investments.

Under the Second Amended Distribution Plan developed by the receiver and approved by the district court (the distribution plan),[4] the private assets of the receivership have been pooled and each client will receive a pro rata distribution of these assets. The value of real estate distributed through interim distributions to individual clients was deducted from the pro rata distribution due to these clients. This treatment of real estate is different from the treatment of publicly-held securities previously distributed to clients, since the distribution of publicly-held securities did not affect the pro rata distribution of private assets.

The distribution plan provides for dividends to clients under a money-in-money-out or "MIMO" formula. Under this formula, the client's net loss is measured by the total amount

---

[4]The parties agree that the order implementing the plan of distribution and a related order concerning individual properties at issue in these appeals are final orders for purposes of appellate jurisdiction or are otherwise appealable. To resolve any doubts as to the appealability of these orders, the district court also certified these orders for appeal under FED. R. CIV. P. 54(b).

invested in private assets (money in) minus the total amount returned to the client before the receivership (money out).[5] Each client receives its pro rata share (computed by that client's loss to total loss of all clients) of its net loss under this formula. The assets of the receivership are insufficient to cover the net losses of the CCL clients. The receiver states that he has made two distributions under the plan, in addition to the earlier distribution of public equities and cash and the interim real estate distributions.

Some clients have brought suits against third parties such as trustees or professional advisors who made the decision to invest client funds with CCL. Some of these claims are covered by insurance or fidelity bonds which retirement plans or other CCL customers purchased themselves,[6] while other claims either are not covered by insurance or are covered by malpractice or other insurance purchased by the third parties who have been sued by the CCL clients or the DOL on behalf of CCL clients. Some third-party suits have been settled, some are ongoing, and some may be initiated in the future. The total number of claims and dollar sums that have been or

---

[5]More precisely, the distribution plan provides that CCL clients shall receive a pro rata share of the receivership's assets "on a Money-in/Money-out basis calculated as follows:

> The total of the cost value of the client's Private Investment Portfolio investments as of January 1, 1996, if any, together with all funds and non-cash assets paid by the client to CCL for the funding of any asset in the Private Investment Portfolio or the payment of Pre Receivership Management Fees from January 1, 1996 through September 21, 2000 ('Money-in'), *less* all principal paydowns, interest payments, or other payments in funds, securities or other property credited to the client's account as a result of its investment in the Private Investment Portfolio from January 1, 1996 through September 21, 2000 ('Money-out'). In addition, to the extent the client obtains or has obtained any Third Party Recoveries, 50% of those amounts shall also be treated as Money-out and deducted from the total Money-in."

[6]We note that ERISA requires fiduciaries and other persons handling plan funds to be bonded. 29 U.S.C. § 1112.

might in the future be recovered via third-party claims are not readily ascertained from the record.

The receiver initially proposed that third-party recoveries should reduce a client's claim to the receivership's private assets on a dollar for dollar basis. After receiving objections to this proposal, the receiver proposed a 50 percent offset, whereby each dollar received through third-party recoveries would reduce the distribution from the receiver by fifty cents. This 50 percent offset provision (the offset provision) became a part of the final distribution plan approved by the district court.

The appellants have filed four appeals challenging the offset provision and other aspects of the distribution plan. Appellants in No. 03-35406 are the Eighth District Electrical Pension Fund and the Eighth District Electrical Benefit Fund (the Electrical Funds). Appellant in No. 03-35407 is the United Association Union Local 290 Plumber, Steamfitter & Shipfitter Industry Pension Trust (the Plumber's Trust). Appellant in No. 03-35409 is the DOL. Appellants in No. 03-35412 are the Oregon Laborers-Employers Pension Trust Fund, the Oregon Laborers-Employers Health and Welfare Trust Fund, and the Oregon Laborers-Employers Defined Contribution Trust Fund (the Oregon Laborers).

## DISCUSSION

"[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986). "[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978). "The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions."

*Hardy*, 803 F.2d at 1037. A district court's decision concerning the supervision of an equitable receivership is reviewed for abuse of discretion. *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999).

### A.   *The Offset Provision*

All appellants except the Plumber's Trust complain about the offset provision. They advocate for the elimination entirely of an offset provision for third-party recoveries.

### 1.   *General Objections*

[1] Appellants object to the offset provision based on general principles of equity and receivership. We believe that the offset provision together with the other terms of the distribution plan represent an administratively workable and equitable method of allocating the limited assets of the receivership. The offset provision imposes a reasonable compromise that balances the goal of encouraging CCL clients to seek third-party recoveries and rewarding them for their efforts, and the goal of distributing the limited assets of the receivership in a roughly equal fashion.

These goals conflict. Eliminating the offset provision would make for a more inequitable distribution of assets by recognizing more loss than these appellants actually suffered. The Ninth Circuit has noted that equity demands equal treatment of victims in a factually similar case. In *United States v. Real Property Located at 13328 and 13324 State Highway 75 North*, 89 F.3d 551 (9th Cir. 1996), an investment advisor pleaded guilty to defrauding his customers and a fund was established to partially reimburse the customers for their losses. The district court approved an SEC-administered plan to distribute the fund to the defrauded customers on a pro rata basis. One customer wanted to receive all the proceeds of a particular real estate sale, claiming that the funds to purchase this property could be traced to it. We held that allowing this

claim in lieu of a pro rata distribution "would frustrate equity," and agreed with the district court that "the equities demand that all [customers] share equally in the fund of pooled assets in accordance with the SEC plan." *Id.* at 553. Quoting the original Ponzi scheme case, we held that "this is a case where 'equality is equity.'" *Id.* at 554 (quoting *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).

We have also approved of offset provisions in cases involving similar equitable considerations. In our view, these cases support the district court's decision in the pending case, despite some factual distinctions. In *In re Cement and Concrete Antitrust Litigation*, 817 F.2d 1435 (9th Cir. 1987), *rev'd on other grounds*, 490 U.S. 93 (1989), we approved of an offset provision in a antitrust class action settlement. The class action alleged a conspiracy to fix prices for cement. The district court approved a plan providing that amounts recovered by any class member from nonsettling defendants would offset that class member's share of the settlement fund. We noted that without such an offset there would exist "the possibility that class members with claims against nonsettling defendants could secure double recovery: collect from the settlement fund for purchases made from settling defendants, and also collect against the nonsettling defendants under another settlement or a judgment." *Id.* at 1439. We held that "in adopting the offset provision, the district judge forged an equitable solution and did not abuse his discretion," *id.* at 1440, and that the offset provision "in effect applies an equitable weighting to claims," *id.* at 1439.

*In re Equity Funding Corp. of America Securities Litigation*, 603 F.2d 1353 (9th Cir. 1979), also involved a class action settlement fund. The suit arose out of the securities fraud perpetrated by Equity Funding Corporation of America (EFCA) and its related companies. EFCA filed for bankruptcy in a separate proceeding, and the class action suit proceeded against accountants and other defendants. The district court approved a settlement plan under which members of the

plaintiff classes would " 'share and share alike' " in the settlement based on their " 'net adjusted losses.' " *Id.* at 1357. The plan provided for an offset which reduced the amount of the class member's net losses by the value of cash and stock received under the EFCA bankruptcy reorganization plan. The district court and the Ninth Circuit approved of the offset provision. While the offset provision was adopted in part to address a peculiar issue concerning the appropriate recovery of one group of class members,[7] the provision was also approved on the basis of the district court's more general belief "that those claimants who had participated in the reorganization proceeding had already received a varying degree of partial recovery for those losses which formed the basis of their claims in the securities litigation." *Id.* at 1363. The district court's approval of the plan derived in part "from the fact that claims of the class members far exceeded the sums in the settlement fund," *id.* at 1365, a fact also present in the pending case.

We note that *Equity Funding* and *Cement and Concrete* involved 100 percent offset provisions, while the pending case only involves a 50 percent offset provision. So any arguments that the offset provision in the pending case would improperly penalize those clients who made efforts to pursue claims in other proceedings would have applied with even greater force in *Equity Funding* and *Cement and Concrete*, yet we approved the 100 percent offset provisions in those cases.

The parties make no persuasive argument that some CCL clients are less deserving of compensation under the distribution plan because they were more sophisticated than other cli-

---

[7]The offset provision addressed the district court's concern that, due to the timing of certain securities offerings, debenture holders had been assigned a relatively high priority as compared with other fraud claimants in the bankruptcy plan, but had claims in the class action which arguably were weaker than the claims of other class members. *Equity Funding*, 603 F.2d at 1365-66.

ents, deliberately made riskier investments, have unclean hands, or other reasons. According to the DOL, "which client ultimately invested in which investment and who was left in the lurch when CCL was shut down was more a product of luck and timing than any exercise of discretion or informed investment decision." All the clients are innocent victims. Eliminating the offset provision could mean a double recovery for some clients, although the parties seem to agree that the chances of a double recovery are small at best, and the offset provision does not eliminate all possibility of a double recovery anyway.[8] Even if no double recoveries occur, eliminating the offset provision would mean at the very least that

---

[8]The Electrical Funds claim in their brief that "[n]o ERISA plan will obtain a double recovery, or windfall, by pursuing claims under its own fiduciary liability insurance or bonds." A double recovery on such claims may not be possible if the insurance company has a right of subrogation. However, while some clients may have recovered insurance proceeds from their own insurance policies subject to a right of subrogation of the insurer, the third-party claims are not limited to such claims. The Oregon Laborers assert that a double recovery is "plainly impossible," but we fail to see why this is so. Indeed, for all we can tell from this record, a double recovery is possible even with the offset provision in place, since the provision only reduces the amount of the MIMO claim by 50 percent of the third-party recoveries. If, as appellants complain, some third-party claims have not even been brought and tolling agreements have been formed to circumvent the effect of the offset provision, it is impossible at this time to conclude that no double recoveries will occur. The Electrical Funds, for example, claim that some CCL clients have "adopted a more sensible strategy of waiting to pursue their claims until after the Receivership closes." The DOL argues that "it is possible (and may well be prudent) for CCL investors to delay asserting third-party claims until after the termination of the receivership." The Oregon Laborers state that "[s]ome claims . . . are subject to investigation and have yet to be litigated." The district court does state in its opinion and order approving of the distribution plan: "I also acknowledge that some clients may reach a 100% recovery between distributions from the Receiver and recoveries from third parties. If this occurs, the Receiver is to temporarily cap that client's distribution until all have received a 100% recovery." However, the court states in the same decision that "[t]he Receiver does not propose to keep the receivership open for any additional period solely to monitor third-party claims," and that tolling agreements might "be used to stretch out a third-party recovery to a point after the receivership is closed." Therefore, the possibility of a double recovery exists, whether the result of a conscious effort to circumvent the court's temporary cap or the offset provision, or any other reason that a client might obtain a third-party recovery after the termination of the receivership.

the partial recoveries for the losses of the innocent CCL clients would be more uneven than recoveries with the offset provision in place.

Appellants variously argue that the offset provision creates a free rider problem, in that it penalizes the CCL client who went to the expense of purchasing insurance or who successfully pursues third-party claims, and correspondingly increases the recovery of those clients who did not purchase insurance or who do not successfully pursue third-party claims. They argue that the offset provision creates a disincentive to pursue third-party claims. We do not find these arguments so compelling that we are persuaded to hold that the district court abused its discretion in approving a distribution plan which includes the offset provision.

First, as discussed above, the offset provision allows for more equal compensation to innocent CCL clients, and equal treatment is a legitimate goal in itself, even if it to some extent conflicts with other legitimate goals. Second, clients still have an incentive to pursue third-party claims, and are still rewarded for their efforts, or their decision to purchase insurance, since only half of any third-party recovery is deducted from the client's net loss claim. Third, to the extent that a client incurs expenses in pursuing a third-party claim, these expenses are offset against the amount of the third-party recovery as measured by the receiver.[9] Only the net third-party recovery is deducted from the receivership claim.

---

[9]We so conclude because paragraph IV(G) of the distribution plan makes reference to net third-party recoveries. The receiver states in his briefing that "[a]ll attorney fees and costs incurred in obtaining the recovery are netted and 50% of that net figure is deducted from the client's claim in the receivership." The district court likewise has interpreted the offset provision as "net of costs and fees," and the Electrical Funds also agree in their briefing that the 50 percent offset is "net of legal expenses."

### 2.   *ERISA Objections*

Appellants argue that the offset provision violates ERISA. They contend, and the receiver does not dispute, that as to those receivership claimants who are ERISA plans, the receiver is an ERISA fiduciary, defined to include a person who, with respect to a plan, "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control regarding management or disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A).

**[2]** Assuming without deciding that the receiver is an ERISA fiduciary, we find nothing in the ERISA statute which prohibits the offset provision. Appellants cite general ERISA provisions requiring a fiduciary to act with prudence and undivided loyalty, and stating that the fiduciary must use plan assets for the exclusive benefit of plan beneficiaries. *E.g.*, 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A) & (B). They also cite a provision prohibiting the transfer of plan benefits to persons other than plan beneficiaries. 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). Appellants do not persuade us that the offset provision violates those provisions.

In this case, any distribution scheme necessarily requires the receiver to divide up assets of the receivership which are inadequate to cover all the net losses of all the CCL clients. A change in the distribution formula that increases the distributions to some clients and reduces the distributions to others does not alone imply a breach of fiduciary duty by the receiver. By this reasoning, *eliminating* the offset clause would violate ERISA since it would favor some ERISA plans over others.

In this context, we find unpersuasive the argument of the Electrical Funds that the receiver violated ERISA because "[u]nder the duty of loyalty, the inquiry is not whether the

50% offset is fair to the CCL clients as a whole. The Receiver must show that he has acted in the best interests of the participants and beneficiaries of *each* of the ERISA Plans." This argument ignores the limited fund aspect of this case. In a zero sum game, favoring one fund necessarily disfavors another. The Oregon Laborers' argument that the receiver never "considered what was *best* for any plan" ignores the impossibility of doing what is best for every claimant to a limited fund. Holding the receiver to a standard of undivided loyalty to a particular client makes little sense in this context. The ERISA statute does not require the fiduciary to achieve the impossible; it requires that he act "with the care, skill, prudence, and diligence *under the circumstances* then prevailing that a prudent man *acting in a like capacity* and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (emphasis added).

To the extent appellants argue that some non-ERISA plans would see increased distributions at the expense of ERISA plans, they cite no authority persuading us that the receiver was legally obligated to favor ERISA plans over non-ERISA plans. The DOL appears to concede that no such higher duty to ERISA clients exists.[10]

Further, appellants do not explain, with appropriate citation to proof in the record, what effect the elimination of the offset provision would have on the overall split of receivership assets between ERISA and non-ERISA claimants. The receiver claims that many ERISA plans are not expected to obtain third-party recoveries. If the receiver is correct, these ERISA plans will actually be worse off if the offset provision is eliminated.

---

[10]The DOL states that it "does not suggest that the receiver's duties of prudence and loyalty obligated him to favor the [ERISA] plans in any way or prioritize their claims."

The DOL argues that it is improper "to require ERISA plans to effectively transfer 50% of recoveries that are uniquely available to them to other CCL investors before the plans have been made whole for their own losses." The Electrical Funds and the Oregon Laborers similarly argue that under ERISA and receivership law the receiver and the district court had no power or "jurisdiction" over their third-party claims, and that ERISA prohibits their "dominion" over such claims. The receiver is not in our view illegally transferring from one ERISA plan to another CCL client an asset belonging to the ERISA plan. The ERISA plan is free to pursue third-party claims as it wishes. The receiver is adjusting the claim of the ERISA plan to the assets of the receivership, to reflect monies received from third-party claims. Ultimately, this argument is simply another way of arguing that the offset rule creates a free rider problem, and we find no provision in the ERISA statute that compels us to alter our analysis or our conclusion that the district court did not abuse its discretion.

**[3]** The district court and the receiver were not attempting to exercise "jurisdiction" over third-party actions. A judge is allowed to reduce a judgment in his own court to reflect the amount a plaintiff has already received from another party or in another proceeding. *See, e.g.*, *Vesey v. United States*, 626 F.2d 627, 633 (9th Cir. 1980); *Layne v. United States*, 460 F.2d 409, 411 (9th Cir. 1972). The court in the pending case was simply fashioning equitable relief in its own case to allow for a more equal distribution of limited funds to the many innocent victims of CCL's collapse. A somewhat similar argument was rejected in *Equity Funding*, discussed above. The district court in that class action approved an offset provision which reduced distributions to class members who had already received assets in a separate bankruptcy proceeding. The Ninth Circuit rejected the argument that the offset violated the "integrity" of the bankruptcy proceeding and held that the distributions made in the bankruptcy court "were not reduced or modified" by the class action settlement plan. 603 F.2d at 1363-64.

### 3.  *Collateral Source Rule*

The Electrical Funds and the Oregon Laborers argue that the offset provision violates the collateral source rule under Oregon law. The DOL makes the same argument, citing the Restatement (Second) of Torts § 920A(2) and comment b. Appellants cite no authority as to why Oregon law or any state's common law should govern this question, and inconsistently argue that ERISA, a statute known for its complete preemption of state law, should govern. Regardless, the collateral source rule strikes us as inapplicable to the circumstances presented.

**[4]** Generally, "[u]nder the collateral source rule, the tortfeasor is not entitled to be relieved of the consequences of its tort by some third party's compensation to the victim." *Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1134 (9th Cir. 2003). In the pending case, the alleged tortfeasors, including CCL and the Graysons, were not relieved of the consequences of their conduct by the offset provision. The offset provision only affected the distribution of limited receivership funds, obtained through litigation and other means, to the various innocent CCL clients. "The primary justifications for the collateral source rule are that the defendant should not get a windfall for collateral benefits received by the plaintiff and that the defendant should not profit from benefits that the plaintiff has paid for himself." *McLean v. Runyon*, 222 F.3d 1150, 1156 (9th Cir. 2000). Again, the alleged wrongdoers pursued by the receiver—the Graysons, CCL, and others—did not receive a windfall from the offset provision. The offset provision only affects how the assets recovered by the receiver are distributed among the innocent claimants. We similarly noted in *Equity Funding* that the offset rule was not applied in that case "to benefit any joint tortfeasor. Rather, the use of the offset was for the purpose of allocating the available settlement funds among the various claimants." 603 F.2d at 1364.

B.   *Treatment of Interim Real Estate Distributions*

The Oregon Laborers and the Plumber's Trust complain about the way interim real estate distributions were treated by the receiver. As discussed above, publicly-traded equities were traced and returned to each client. The value of the public equities did not affect the distribution of pooled private assets under the receiver's distribution plan. Instead, each client's claim to the pooled private assets was a pro rata share of that client's net loss in the private investments only.

The receiver later allowed CCL clients to take interim distributions of real estate assets. The Oregon Laborers and six other clients took an interim distribution of a building known as the AT&T building, and the Plumber's Trust took distributions of three properties known as Crimson Corners, One Tech, and Two Tech. Unlike the public securities, the value of an interim real estate distribution was deducted from the client's claim under the distribution plan, thereby reducing its loss and pro rata share.

### 1.   *Oregon Laborers*

The Oregon Laborers complain that the receiver should not have given different treatment to the public equities and the real estate parcels traced and distributed to particular CCL clients via interim distributions. They argue that either (1) the receiver should have included the public equities in the pooled assets, presumably using a net gain or loss calculation similar to that used for private investments; or (2) the receiver should not have deducted the value of interim real estate distributions from clients' claims to the receivership's pooled private asset fund.

This argument is not wholly without merit. While some CCL clients had agreements restricting investments in public securities, these requirements were not always followed, and in the end the mix of private and public investments for any

particular client was a matter of chance. As the receiver concedes in his brief, "clients were frequently swapped in and out of particular investments in order to meet funding requirements and client requests to liquidate investments. In the end, by the time the receivership was initiated, a particular client's portfolio mix was, to a large degree, a result of fortuity."

However, we cannot agree that failing to treat the public and private equities in an identical fashion was an abuse of discretion. The receiver's prompt distribution of public equities (along with cash) allowed the receiver to return a large portion of CCL assets under management to the CCL clients or new investment managers, rather than tying these assets up for years in this receivership litigation. In an affidavit, the receiver justified this treatment of public equities on "their relatively liquid nature, volatility in price, and the lack of competent CCL staff to manage the public equity portfolios on a daily basis." This justification strikes us as entirely sound. The receiver was not in a position to actively manage portfolios of publicly-traded securities for clients in addition to his other difficult duties. There was no need to pool the public equities to facilitate their liquidation. The distribution was made promptly, before the receiver had time to conduct litigation and mediation regarding the private assets, and otherwise attempt to marshal the private assets and the proceeds from the management and bulk sale of these assets. As far as we can tell from the record, no CCL client preferred that the public equities remain under the control of the receiver or objected to the early distribution of these assets out of the receivership.

[5] Looking at the treatment of interim distributions of real estate, the receiver was entirely justified in deducting the value of a distribution to a particular client from that client's claim to the remaining pooled private assets of the receivership. There is simply no sound reason to do otherwise, if the distribution of private assets is considered by itself, without regard to the earlier distribution of public equities. A party

should have his claim to the pooled fund reduced by the value of the property he received, since such a distribution is a valuable dividend just like any other dividend of assets from the receivership.

Failing to deduct the value of the interim distribution of the AT&T building would be particularly unfair, since the Oregon Laborers chose to take an interim distribution of that property, which is worth more than they paid for it, but chose to leave in the common pool of private assets two other properties which are worth less than they paid for them. In effect, the Oregon Laborers want to keep for themselves their winner, but leave their losers in the shared pool. We agree with the district court that this result would be inequitable.

Our only difficulty is deciding whether, assuming that the early distribution of public equities was warranted, the *value* of the public equities should have been carried in the receiver's books and considered when calculating the net loss of each client, for purposes of deciding each client's pro rata share of the private assets pooled in the receivership. In theory, the receiver could have calculated each client's net loss based on client funds invested in both public and private assets. To the extent the Oregon Laborers make this argument, we find it a close one.

We conclude, however, that the district court did not abuse its discretion in overruling this objection. First, requiring the calculation of public equity gains and losses would impose a massive new administrative burden on the receiver, one he describes as Herculean. The receiver was not previously required to calculate gains and losses in the public securities because they were simply returned to individual clients or designated agents.

Second, there is some inconsistency in the Oregon Laborers' position. Like other appellants, they argue that their third party recoveries should not in effect be pooled through the

offset provision, because these recoveries are separate assets belonging to each CCL client, but they take issue with the receiver's failure to pool all the public assets held by CCL clients. Clever lawyers can no doubt explain away this apparent inconsistency, but the truth is that all appellants (except the DOL) make elaborate and less than compelling arguments for redistributing the assets of the receivership in ways that will benefit them at the expense of other CCL clients or even each other.

Third, the receiver points out that recalculating gains and losses at this late stage based on a unified approach that considers the gains and losses in both public and private assets would require some innocent clients to disgorge the value of distributions of public equities received years ago. Such a result strikes us as unnecessary and undesirable.

An analogous line of authority holds, in the bankruptcy context, that a reorganization plan should not be "undone" if it has been substantially implemented and it would be inequitable for the court to consider the merits of an appeal due to a "comprehensive change of circumstances." *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981). The courts sometimes refer to this doctrine as the "equitable mootness" doctrine. The doctrine turns in part on whether the appellant moved for a stay in the district court. *Id.* The Oregon Laborers did not move to stay the distribution of public equities.[11] The

---

[11]The Oregon Laborers point out that, in seeking the early distribution of public equities, the receiver stated to the court and to CCL clients that he was reserving claims the receivership may have to the value of the public equities, including the right to offset their value against future distributions. Nevertheless, the Oregon Laborers did not seek a stay of the distribution of public equities, nor do they point to any proof that they were remotely interested in such a stay or in the pooling of public equities at the time the receiver distributed them. The Oregon Laborers also claim that early in the receivership the receiver even stated that he might find it necessary to seek disgorgement of the public equities, but their record cite is to a passage in an interim report less than two months after the receiv-

doctrine also turns in part on whether the transactions at issue are complex and would be difficult to unwind. *In re Lowenschuss*, 170 F.3d 923, 933 (9th Cir. 1999). The receiver persuades us that attempting at this stage to pool the value of the public securities with the private assets and to recalculate every CCL client's net loss would be a highly complex undertaking. The ability of the receiver to require and obtain disgorgement where necessary, at a reasonable cost, is also in question.

Even where the appellate court does not find the equitable mootness doctrine applicable, we have held, in a case where we refused to order a disgorgement of fees and expenses, that "a court may still hold that the equities weigh in favor of dismissing the appeal." *In re S.S. Retail Stores Corp.*, 216 F.3d 882, 885 (9th Cir. 2000).

[6] The pending case is not a bankruptcy case that falls squarely within the equitable mootness doctrine, but the circumstances are sufficiently analogous for us to conclude that the district court did not abuse its discretion in rejecting the Oregon Laborer's request for identical treatment of public equities and interim real estate distributions.

---

er's appointment, where he states that he "must be careful not to overpay dividends from the liquidation of *Private Investments* in order to minimize the need to seek disgorgement of funds from clients" (emphasis added). We cannot tell whether this passage is referring to the possible need for disgorgement of public equities or private assets to be distributed by the receiver at a later date. Furthermore, by the time of this report, the distribution of public equities was underway, and the receiver states at the beginning of this report, in bold print, that due to "the shortness of time, the complexity of the matters analyzed and the need for additional information," the report must be considered preliminary and "the Receiver may need to materially modify its contents after further consideration." Even if the receiver had stated that disgorgement of public equities might be necessary, there is no citation to the record to prove that the Oregon Laborers sought a stay of the distribution of public equities, or refrained from doing so based on reliance on this preliminary, cryptic comment made after the distribution had begun.

2.   *Plumbers*

Three real estate parcels known as One Tech, Two Tech, and Crimson Corners were returned to the Plumber's Trust via interim distributions. The Plumber's Trust complains that the receiver effectively "took" or "seized" these properties and improperly gave them to others. They argue that the properties should be excluded from the receivership estate. We reject this argument.

All of the assets held by CCL and later by the receiver were held in trust for CCL's clients. The three parcels at issue were returned to the Plumber's Trust. As with other interim real estate distributions, the value of these assets were deducted from the Plumber's Trust's claim to the pooled private assets held by the receiver and distributed pro rata to CCL clients. We endorse the fairness of this approach for the reasons discussed above. The Plumber's Trust give no persuasive reasons that their properties were entitled to different treatment.

[7] To the extent that the Plumber's Trust complains that the parcels "belonged" exclusively to them, and must be returned to them under ERISA or principles of receivership or property law, these properties were returned to them. To the extent that it argues that it "owned" the properties or had "title," "legal title," or "sole legal title" to them, we fail to grasp the significance of such ownership with respect to the equitable distribution of CCL's assets under management. The receiver did not sell the properties and thereby divest the Plumber's Trust of its legal title to them. Equitable, if not legal, title to *all* assets under the management and control of CCL was held by CCL clients. This is always the case where a fiduciary or agent manages assets for a principal. All garden-variety stock brokerage firms, for example, hold equities in trust for their clients, and holding the stock in street name is little more than an administrative convenience that does not deprive the clients of equitable and legal rights in the

securities.[12] By the reasoning of the Plumber's Trust, the district court could not have ordered the pooling and pro rata distribution of public equities, because each client owns and has title to the equities CCL purchased for that client's account, a position directly at odds with the position of the Oregon Laborers, who argue that the pooling of public equities was not only allowed but required if the receiver does not alter its treatment of interim real estate distributions. In our view, the pooling and pro rata distribution of public equities was neither prohibited nor required by ERISA or general principles of receivership or state property law.

Whether or not legal documents identified the Plumber's Trust or CCL as the title holders of the properties strikes us as irrelevant to the receiver's task of equitably distributing the private assets CCL invested in and controlled for the benefit of its clients, once one accepts that the pooling of such assets and a pro rata distribution was an appropriate method of equitably distributing the private assets. We agree with the district court that a pooling and pro rata distribution, as opposed to the tracing of assets, was appropriate. *See Real Property*, 89 F.3d at 553.[13]

We do not understand the Plumber's Trust to argue that pooling should be abandoned entirely. Indeed, the Plumber's

---

[12]*See Silber v. Mabon*, 957 F.2d 697, 699 (9th Cir. 1992) ("Under common industry practice, most publicly traded stock is held in the 'street name' of brokerage houses for the benefit of their customers. Only brokerage houses or other 'record owners' appear on official corporate transfer records. The actual interest in the stock (and consequently, the interest in any lawsuit relating to the stock) is that of the beneficial owner.").

[13]In *Real Property*, we agreed with the following "eminently sensible statement of the law" by the district court: " '[W]here, as here, the struggle over the res derived from fraudulent conduct is between innocent parties, tracing should not and will not apply. . . . Instead of engaging in a tracing fiction, the equities demand that all [defrauded customers] share equally in the fund of pooled assets in accordance with the SEC plan.' " 89 F.3d at 553.

Trust does not object to other properties in which it has partial ownership interests being left in the receivership for pooling and pro rata distribution. Like the Oregon Laborers, the Plumber's Trust wishes to engage in cherry picking, taking for itself those properties in which it has a gain and leaving in the shared pool of assets the properties in which it has huge losses.

The only colorable argument the Plumber's Trust appears to make is that the three parcels at issue were never under the control and management of CCL, and therefore did not devolve to the receiver for distribution in any manner. Stated another way, the Plumber's Trust argues that the receiver's interim distribution of the properties was a non-event, in that the properties were never part of the receivership estate, and should not have been considered when calculating the Plumber's Trust's pro rata claim to the remaining pooled private assets of the receivership. We reject this argument.

The order appointing the receiver granted him "full powers of an equity receiver, including . . . full power over all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise controlled), . . . and other property belonging to or in the possession of or control of Capital Consultants. . . ." CCL decided to place the Plumber's Trust as an investor in the three parcels and the properties were controlled and managed by CCL like other assets under CCL management. In our view, there is nothing unique about these properties that places them outside the receivership. They were, like other assets belonging to the Plumber's Trust and other clients, part of a portfolio of assets managed by CCL as agent for the benefit of the Plumber's Trust.

The documentation in the record, whose authenticity is not disputed, indicates that CCL had significant if not absolute management and control authority over the three properties. Under investment advisory agreements between CCL and the

Plumber's Trust, CCL had broad authority to manage and control assets for the Plumber's Trust.[14]

CCL's authority is apparent from the management history of the individual properties. The Crimson Corners property was a shopping center originally built with a loan from another CCL client. The client decided to terminate its relationship with CCL, so CCL substituted Plumber's Trust on this loan through a document styled an assignment of trust deed. The borrower later defaulted on this loan and a deed in lieu of foreclosure was prepared naming the Plumber's Trust as the title holder of this property. We agree with the receiver that it was fortuitous that the default and the decision of another client to terminate its relationship with CCL resulted in the Plumber's Trust being named in a deed as fee title owner to this property. The Plumber's Trust played no role in selecting this property as a part of its asset portfolio.

The One Tech and Two Tech properties were adjacent properties conveyed to general partnerships in 1984 and 1985, respectively. Plumber's Trust board meeting minutes indicate that the initial Plumber's Trust investment in One Tech was proposed by CCL, with a view toward keeping the assets of

---

[14]Under a 1975 Investment Advisory Agreement, CCL was granted the authority to manage a designated portfolio of assets for the Plumber's Trust, and was authorized "to invest and reinvest the assets in the Portfolio on behalf of CLIENT. ADVISER's authority includes the power to purchase, sell and exchange property, and exercise whatever rights are conferred upon the holder of property held in the Portfolio. . . ." Attached to this agreement and incorporated by reference was CCL's standard form Trading Authorization and Limited Power of Attorney, appointing CCL as the agent and attorney in fact for the Plumber's Trust, "with full power and authority . . . to buy, sell, and to trade in stock, bonds and any other securities, commodities, or other properties . . . ." A 1994 Trading Authorization and Limited Power of Attorney contains the same language. A 1987 Investment Advisory Agreement states that CCL, "in its sole discretion, shall have the unlimited right to invest and reinvest the Plan's assets."

the trust diversified.[15] The Plumber's Trust was one of three general partners in each of these partnerships. Funds from the Plumber's Trust were used to construct buildings on the One Tech and Two Tech properties pursuant to the terms of the partnership agreements. The partnership agreements were signed on behalf of the Plumber's Trust by David Nelson, a CCL vice president. The agreements required that notices to the Plumber's Trust be sent to CCL and counsel for CCL, rather than to the Plumber's Trust or its counsel. The other two partners withdrew from the partnerships in 1998, pursuant to agreements signed by CCL vice president Linda Lucas on behalf of the Plumber's Trust. In 1995, CCL recommended that the direct management of the buildings constructed on the One Tech and Two Tech properties "be taken in-house by [CCL] in order to effect a cost savings to the Trust of approximately 30%." The Plumber's Trust agreed to this proposal.

In 1999, CCL's Linda Lucas, on behalf of the Plumber's Trust, conveyed One Tech and Two Tech to limited liability companies in which the Plumber's Trust was the sole member. Under Operating Agreements also signed by Lucas, CCL was named as the sole manager of these companies, with the "sole and exclusive right to manage the business of the Company," including the right and power to control and manage the properties, although it appears that the approval of the

---

[15]Minutes of an August 10, 1984 board meeting indicate that there was a discussion of the investment earlier reported on by Mr. Grayson of CCL. August 17, 1984 minutes state that further discussion of the investment occurred at a board meeting held at CCL offices. "The Trustees discussed this investment of approximately $3 million in view of ERISA and the portfolio diversification." Counsel for the Plumber's Trust, Mr. Zalutsky, "reminded the [Plumber's Trust] Trustees that Capital Consultant's Inc. has the responsibility to make investment decisions for the Plan. The purpose of this meeting was merely to advise the Trustees of the investment. Mr. Zalutsky inquired and Mr. Grayson [of CCL] confirmed that Capital Consultants, Inc. has the sole responsibility for the investments of the Trust . . . ."

Plumber's Trust was required before CCL could sell the properties in their entirety.[16]

The Plumber's Trust offered an affidavit from a title company officer opining that CCL lacked the authority to transfer "insurable title" to the three properties, but the investment advisory agreements, operating agreements, and related documents gave CCL authority to control and manage these properties at the very least. Whether a title company would be willing to issue title insurance does not decide the question of whether these properties were under the control and management of CCL in like manner with other private assets of CCL clients for purposes of deciding whether to treat these properties as part of the receivership. To the extent that the Plumber's Trust relies on its expert's opinion to argue the extent of CCL's authority under the agreements between these parties, the interpretation of these agreements and their legal effect is

---

[16]Specifically, the Operating Agreements granted CCL the exclusive "right and power, on behalf of and in the name of the Company, to . . . [p]urchase, take receive, lease or otherwise acquire, own, hold, improve, use and otherwise deal in or with real or personal property or any interest in real or personal property, wherever situated," and to "[s]ell, convey, mortgage, pledge, create a security interest in, lease, exchange, transfer and otherwise dispose of all or any part of the Company property or assets." The agreements also provided, however, that the approval of the Plumber's Trust was required before CCL as manager could sell or transfer all or substantially all the assets of the company. So far as we can tell the One Tech and Two Tech properties were the only assets of the limited liability companies. However, the receiver contends that even though the Operating Agreements required the Plumber's Trust's consent to sell the properties, the then operative Trading Authorization and Limited Power of Attorney, described above, gave CCL authority to give that consent as the Plumber's Trust's agent and attorney in fact. We also note that while CCL might have needed the approval of the Plumber's Trust to sell the properties, it does not follow that the Plumber's Trust had authority to sell the properties, since the Operating Agreements also state that the Plumber's Trust, as a member of the limited liability companies who was not a manager, "shall not have any authority or power to act as agent for or on behalf of the Company, [or] to do any act which would bind the Company with respect to any third party . . . ."

an issue of law for the court. Experts may interpret and analyze factual evidence but may not testify about the law. *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996).

**[8]** With regard to the three properties, the district court was faced with a novel and arcane dispute. "As we have recognized, case law involving district court administration of an equity receivership . . . is sparse and is usually limited to the facts of the particular case." *Hardy*, 803 F.2d at 1037. The district court carefully analyzed the history of the three parcels in a separate opinion. It concluded, "[b]ased on CCL's control of the three pieces of real property . . . that all three should be included in the receivership estate and distribution plan." We agree with this conclusion. During the relevant period the three properties were always a part of the portfolio of assets under the management of CCL for the benefit of the Plumber's Trust or another client. The Plumber's Trust offers no legal or equitable reasons compelling us to hold that the district court abused its discretion in allowing the receiver to deduct from the Plumber's Trust's pro rata distribution claim the value of the three parcels it had already received via interim real estate distributions. Given that "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad," *Hardy*, 803 F.2d at 1037, and that "the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership," *Lincoln Thrift*, 577 F.2d at 606, the district court was not required to do otherwise.

AFFIRMED.

---

W. FLETCHER, Circuit Judge, concurring and dissenting:

All members of the panel agree that the Receiver has done an excellent job in this difficult and complex case, and I agree

with the majority's opinion in all respects but one. Unlike the majority, I would hold that the district court erred in approving the 50% offset for damages recovered by ERISA plans from third parties.

The United States Secretary of Labor ("the Secretary") has the statutory responsibility to administer ERISA. *See*, *e.g.*, 29 U.S.C. §§ 1031(c) and 1135 (authority to issue regulations); *id.* § 1132 (a)(2) (authority to bring civil enforcement actions); *id.* § 1134 (investigative authority); *id.* § 1137 (administrative procedure); *id.* § 1138 (appropriations to carry out "functions and duties" under ERISA). The Secretary contends that the 50% offset for third-party recoveries violates ERISA. I agree with the Secretary.

The Secretary was the first to file suit contending that Capital Consultants, LLC ("CCL") had violated ERISA and seeking a receivership. After the Secretary filed suit, plan trustees filed suit under ERISA; non-ERISA investors filed suit under federal and state laws; and the Securities and Exchange Commission filed suit under the federal securities laws. Over the course of several years, the Receiver marshaled the assets of CCL, made some distributions to claimants, and recommended a final plan of distribution that was approved by the district court.

The parties and the district court agree that the Receiver is a fiduciary of the ERISA plans that are claimants in the receivership. The majority opinion merely assumes without deciding that the Receiver is an ERISA fiduciary, Maj. Op. at 1358, but in my view the point is beyond debate. Under ERISA, a person "is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus

expanding the universe of persons subject to fiduciary duties — and to damages —" under the statute. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (citation omitted; emphasis in original). We construe ERISA fiduciary status "liberally, consistent with ERISA's policies and objectives." *Ariz. State Carpenters Pension Trust Fund v. Citibank (Ariz.)*, 125 F.3d 715, 720 (9th Cir. 1997).

As an ERISA fiduciary, the Receiver must comply with ERISA's fiduciary duties of loyalty. ERISA requires that

> a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* and —
>
> > (A) *for the exclusive purpose of*:
> >
> > > (i) *providing benefits to participants and their beneficiaries*[.]

29 U.S.C. § 1104(a)(1) (emphasis added). ERISA fiduciary duties are "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwith*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). As a result, an ERISA fiduciary must have " 'an eye single' toward beneficiaries' interests." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan*, 680 F.2d at 271).

The majority holds that the Receiver acted within his discretion when he required that any claim by an ERISA plan would be offset by 50% of any recovery from third parties by that plan. Although the majority does not say it in so many words, it holds that the Receiver's fiduciary obligation under ERISA was overridden by some general interest in fairness, as the Receiver understood fairness, to other receivership claimants. However, the majority points to no provision in ERISA itself, or in the federal common law of ERISA, that would permit such a result.

In interpreting ERISA's fiduciary provisions, we draw on the common law of trusts unless it is inconsistent with the statute's language, structure, or purposes. *See Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000); *Waller v. Blue Cross of Calif.*, 32 F.3d 1337, 1344 (9th Cir. 1994). Trustees of ERISA plans (and, by extension, fiduciaries occupying positions analogous to trustees) have an obligation to preserve all assets of the plan. As the Supreme Court wrote in *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559 (1985), "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets[.]" *Id.* at 572; *see also Collins v. Pension and Ins. Comm.*, 144 F.3d 1279, 1283 (9th Cir. 1998) ("Plan trustees have a general duty to ensure a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.").

In this case, a number of ERISA plans have brought successful third-party suits arising out of the CCL debacle. Many, though not all, of those suits were brought against ERISA plan trustees for insufficient supervision of the plans' investments with CCL. *See* 29 U.S.C. § 1104(a) (setting forth standard of care). Recoveries have come not only from the trustees and their insurers, but also from insurance policies purchased by the ERISA plans to cover shortfalls in recoveries from trustees. *See id.* § 1110(b)(1) and (b)(2) (permitting both trustees and plans to purchase insurance for losses arising from fiduciary breach). No one disputes that, absent the receivership, all of the third-party recoveries would be assets of the ERISA plans. Moreover, no one disputes that the plans paid their trustees salaries sufficient to induce them to serve as trustees despite their liability for mismanagement, and that many of the plans paid for additional insurance out of plan assets.

I accept as fully applicable to this case the equal treatment principle of receivership law. Equality is, indeed, equity. *See*, *e.g.*, *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (in distrib-

uting assets of estate in bankruptcy, "equality is equity"); *United States v. 13328 & 13324 State Highway 75 North*, 89 F.3d 551, 553-54 (9th Cir. 1996) (disallowing tracing claim in equity receivership when assets of all defrauded creditors had been commingled; quoting the "equality is equity" phrase from *Cunningham*). But the "equality is equity" principle does not mean necessarily, or even usually, that all claimants must receive equal percentage payouts on their claims. For example, equality of treatment of secured creditors and unsecured creditors in bankruptcy does not mean that both receive equal percentage payouts. Rather, secured creditors receive all they are owed, up to the value of their security. Or, to take an even more obvious example, equality of treatment in bankruptcy does not mean that claimants get more or less from the bankruptcy estate depending on what other assets they have.

In this case, the ERISA plans are comparable to bankruptcy creditors who have assets outside the bankruptcy estate. The plans are claimants in the receivership, and they have assets — in the form of recoveries from third parties — that, absent the receivership, are their sole and undisputed property. The right to these assets was purchased by the plans prior to and independently of the receivership. The third-party suits, and the resulting plan assets, effectuate Congress's desire in ERISA to provide special protection to participants and beneficiaries of ERISA plans. *See* 29 U.S.C. § 1001(b*).*

All investors in CCL were free to purchase insurance, or otherwise to pay to protect themselves against malfeasance. If they did not, that was their choice. The choice not to purchase insurance or other protection was not irrational, for it produced an obvious potential benefit: If CCL had performed as promised, such investors would have earned a higher rate of return on their investment as a result of not having paid that money. Yet the Receiver and the panel majority have approved a distribution plan that takes away 50% of the third-party recoveries of the ERISA plans, for which those plans have paid and for which other claimants have not.

The majority's decision is purportedly in the service of the "equality is equity" principle. But the Receiver (and the majority) cannot justify the offset based on that principle, for if the Receiver really believed the principle required negating the plans' third-party recoveries, he would not have required merely a 50% offset. He would have required a 100% offset. Far from producing equality of treatment, the 50% offset makes the inequality more obvious. The Receiver (and the majority) are in the uncomfortable position of recognizing that the equal treatment principle does not dictate the 50% offset, but nonetheless requiring that the ERISA plans submit to it. The principle now appears to be that the non-ERISA claimants are entitled to some of the ERISA plans' money, but just not all of it.

The majority makes a number of arguments in favor of the 50% offset. First, it relies on two supposedly comparable cases in which offsets were allowed in receivership cases. In *In re Cement and Concrete Antitrust Litigation*, 817 F.2d 1435 (9th Cir. 1987), *rev'd on other grounds*, 490 U.S. 93 (1989), purchasers of cement brought an antitrust class action against cement manufacturers. A number of the defendants settled and paid into a settlement fund. We allowed all claimants against the settling companies to claim against the fund, but required those claimants who had already recovered from non-settling defendants (who had not paid into the fund) to offset that recovery against any claim against the fund.

*In re Equity Funding Corp. of America Securities Litigation*, 603 F.2d 1353 (9th Cir. 1979), was a securities class action arising out of the fraud perpetrated by Equity Funding. The suit was brought by investors against accountants, rather than against Equity Funding itself. Equity Funding filed for bankruptcy in a separate proceeding. A distribution was made in the bankruptcy proceeding to debenture holders and equity owners. In the suit against the accountants, a settlement fund was established. Distribution from the fund was made to all claimants, but with a dollar-for-dollar offset for the debenture

holders and equity owners based on their earlier distributions from the bankruptcy proceeding. The debenture holders complained that the dollar-for-dollar offset was unfair to them, as compared to the equity owners. They argued that because they had received a much larger percentage of their claims than the equity owners in the bankruptcy proceeding, the offset therefore had a disproportionately adverse affect on them. We sustained the dollar-for-dollar offset for both the debenture holders and the equity owners, based in substantial part on the rationale that the merits of the debenture holders' claims against the accountants were weaker than the merits of the equity owners' claims. Thus, the disproportionate adverse effect of the offset on the debenture holders was fair, given the disproportionate weakness of their claims on the merits.

Neither *In re Cement* nor *In re Equity Funding* is easily comparable to this case. In *In re Cement*, claimants who had already received compensation for the harm they had suffered were required to take an offset when they claimed compensation from the settlement fund for that same harm. Here, by contrast, some ERISA plans have suffered distinct and separately compensable harms arising from the acts or omissions of plan fiduciaries. In *In re Equity Funding*, the debenture holders complained only that their offset was disproportionate to the offset for the equity owners; they did not argue that they should be free from any offset. More important, in neither case was there a claim of fiduciary duty under ERISA or a comparable statute.

Second, the majority contends that not requiring an offset for the ERISA plans' recoveries from third parties "could mean a double recovery for some clients." Maj. Op. at 1356. The majority refers to the possibility that an ERISA plan might recover more than its actual loss if its third-party recovery is added to its distribution from the receivership without offset. The majority's concern is a strawman. There is no showing on the record before us that any "double recovery" would occur. The majority itself concedes that "the parties

seem to agree that the chances of a double recovery are small at best." Maj. Op. at 1356. The Eighth District Electrical Pension Fund, one of the ERISA plan plaintiffs, asserts that a "double recovery" will not result from insurance recoveries: "No ERISA plan will obtain a double recovery, or windfall, by pursing claims under its own fiduciary liability insurance or bonds. The fundamental purpose of fiduciary liability is to make the trust whole, not provide a double recovery." For her part, the Secretary "does not challenge the authority of the District Court or the receiver to structure relief to ensure that the plans do not receive more than a full recovery."

Third, the majority contends that "the offset provision allows for more equal compensation to innocent CCL victims[.]" Maj. Op. at 1357. "More equal compensation" is precisely what the offset provision does *not* allow, if equality means equal treatment to equally situated parties. For example, the offset disregards the difference between ERISA plans that purchased insurance and claimants that did not, giving both purchasers and non-purchasers a claim to the insurance proceeds. Under the majority's rationale, in the case of a common catastrophe, a family whose now-deceased breadwinner did not purchase life insurance should have a claim on the life insurance proceeds of the family next door whose now-deceased breadwinner did purchase such insurance.

Fourth, the majority contends that ERISA would be violated if there were no offset provision:

> A change in the distribution formula that increases the distributions to some clients and reduces the distributions to others does not imply a breach of fiduciary duty by the receiver. By this reasoning, *eliminating* the offset clause would violate ERISA since it would favor some ERISA plans over others.

Maj. Op. at 1358 (emphasis in original). The majority appears to think that the Receiver's fiduciary duty requires him to

even out recoveries from third parties among all ERISA plans, regardless of whether a particular ERISA plan has obtained a third-party recovery. But this is demonstrably not true. There are substantial variations among the ERISA plans in the receivership. Some ERISA plans do not have any third-party recoveries at all. These plans' trustees may have been careful but nonetheless duped by CCL, or these plans may have delayed seeking any third-party recoveries. Other ERISA plans have already recovered against their trustees. Among those who have recovered against their trustees, some have recovered additional amounts based on insurance policies protecting against shortfalls in compensation in suits against trustees.

An ERISA fiduciary, including a Receiver, may not take assets belonging to one ERISA plan and simply distribute those assets to another ERISA plan of which it is also a fiduciary. Far from being required to equalize distribution to all ERISA plans, the Receiver is *forbidden* to equalize distributions if such equalization requires taking assets of one plan and giving them to another.

Fifth, the majority contends that the Secretary appears to have conceded that the offset is proper:

> To the extent appellants argue that some non-ERISA plans will see increased distributions at the expense of ERISA plans, they cite no authority persuading us that the receiver was legally obligated to favor ERISA plans over non-ERISA plans. The DOL [Department of Labor] appears to concede that no such higher duty to ERISA clients exists. /FN 10/

— — — —

/FN 10/ The DOL states that it "does not suggest that the receiver's duties of prudence and loyalty obli-

gated him to favor the [ERISA] plans in any way or prioritize their claims."

Maj. Op. at 1359 (first bracket added). The majority has mis-read the Secretary's brief. The paragraph from which the sentence in the majority's footnote 10 was taken carries precisely the opposite meaning. The Secretary first describes the duties of an ERISA fiduciary. She then writes the following paragraph, reproduced here in its entirety:

> In this context, the Secretary *does not suggest that the receiver's duties of prudence and loyalty obligated him to favor the plans in any way or prioritize their claims.* But she does contend that the receiver could not, consistent with his fiduciary duties, treat any plan unequally by disfavoring it with respect to the other clients of CCL. Nor could the receiver require the plans, in effect to transfer their assets to others CCL investors, whether they are other plans or non-plan clients. This is, in fact, what the receiver's distribution plan does.

(Emphasis indicates language quoted by the majority.)

Finally, the majority contends that the 50% offset does not actually take third-party recoveries from the ERISA plans: "The receiver is not in our view illegally transferring from one ERISA plan to another CCL client an asset belonging to the ERISA plan." Maj. Op. at 1360. Of course, the majority is right in saying that it is not transferring ERISA plan assets in the sense of seizing assets from a plan and conveying those assets to another CCL client. But that is a distinction without a difference. The offset has precisely the same consequence as seizing 50% of a plan's third-party recoveries, for the plan is denied money that it would otherwise receive from the receivership, solely because of its third-party recovery. The Receiver's duty of loyalty to the ERISA plans for which he

is a fiduciary is a real duty, not a technicality, and cannot be avoided by a lawyerly sleight of hand.

I would hold that the Receiver is a fiduciary of the ERISA plans that are claimants in the receivership; that the third-party recoveries are plan assets for which the ERISA plans have paid; that the Receiver has a duty to protect those assets on behalf of the plans; that the 50% offset effectively requires the plans to donate half of their third-party recoveries to the common pool of the receivership; and that the offset requirement violates ERISA.

I recognize that many of my arguments apply to the non-ERISA receivership claimants who have recovered from third parties, and I regard it as a close question whether the Receiver abused his discretion in providing a 50% offset as to those third-party recoveries. However, the Receiver is not an ERISA fiduciary as to these claimants. Because ERISA is the determining factor in my conclusion that the offset is improper as to the ERISA plans, I would not reverse the 50% offset for third-party recoveries by non-ERISA claimants. I would nevertheless remand to the district court to allow the Receiver to determine, within his discretion, whether he wishes to retain the 50% offset for non-ERISA claimants if the offset is improper for ERISA claimants.