[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13650
_____

D.C. Docket No. 1:15-cv-03904-WSD


SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

AL B. HILL,

Interested Party-Appellee,

versus

JAMES A. TORCHIA,
CREDIT NATION CAPITAL, LLC,
CREDIT NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES, LLC,
AMERICAN MOTOR CREDIT, LLC, et al.,

Defendants,

RICHARD SUTHERLAND,
KATHERINE SUTHERLAND,

Interested Parties-Appellants.

_____

No. 17-13651

_____

D.C. Docket No. 1:15-cv-03904-WSD

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

AL B. HILL,

Interested Party-Appellee,

versus

JAMES A. TORCHIA,
CREDIT NATION CAPITAL, LLC,
CREDIT NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES, LLC,
AMERICAN MOTOR CREDIT, LLC, et al.,

Defendants,

RICHARD SUTHERLAND,
KATHERINE SUTHERLAND,
ANTONIO DUSCIO,
WILLIAM RUMER,
SONYA GRAVITT,
SHIRLEY GREGORY,
JAMES GREGORY,
CHARLES HEILD,
JAMES HOYER,
THOMAS JONES,
SARAH JONES,
TINA COLEMAN,
THOMAS KELLY COLEMAN,

2

HOLLY HOOD,
MARGARET COLEMAN,
NANCY HOYER,

                                                Interested Parties-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(April 30, 2019)

Before WILSON and JORDAN, Circuit Judges, and MOORE, District Judge.[*]

JORDAN, Circuit Judge:

In 1903, Charles Ponzi emigrated from northern Italy to Boston, Massachusetts, with almost nothing. *See* Mitchell Zuckoff, *Ponzi's Scheme: The True Story of a Financial Legend* 6–7 (2006). More than one hundred years later, his surname still frequents the headlines of America's largest news outlets. *See, e.g.*, Diana B. Henriques, *Madoff Is Sentenced to 150 Years for Ponzi Scheme*, N.Y. Times, June 29, 2009, at A1. Mr. Ponzi is widely credited with conceiving a fraudulent investment scheme in which potential investors are lured with promises of high returns, the fraudsters skim a portion of the incoming investments, and the remaining funds are redirected to pay the returns promised to previous investors who

_____

[*] The Honorable William T. Moore, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

3

are lulled into believing that the expected returns are being realized. *See generally United States v. Orton*, 73 F.3d 331, 332 n.2 (11th Cir. 1996) (outlining the parameters of the scheme). So long as the fraudsters can attract enough new investments to cover the returns promised to previous investors, the scheme can continue.

Mr. Ponzi's scheme collapsed after investors were defrauded of millions of dollars, causing half-a-dozen banks to crash. *See Cunningham v. Brown*, 265 U.S. 1, 7–8 (1924). *See also* Zuckoff, *Ponzi's Scheme*, at 198, 295; Mary Darby, *In Ponzi We Trust*, Smithsonian Mag., Dec. 1998, at 134–60 (also available at https://www.smithsonianmag.com/history/in-ponzi-we-trust-64016168/). In the end, those investors only recovered about thirty cents on the dollar. *See* Zuckoff, *Ponzi's Scheme*, at 106.

In the century since Mr. Ponzi conned the people of Boston, the U.S. legal system has improved its response to financial scams. *See generally* Eric Lode, Annotation, *Judicial Remedies for Proceeds and Funds from Ponzi Schemes*, 100 A.L.R.6th 281 (2014). For example, courts now regularly appoint receivers to manage the entities used in Ponzi schemes, collect and sell any assets connected to the fraud, and distribute the proceeds to defrauded investors. *See Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014) (citing *S.E.C. v. Elliott*, 953 F.2d 1560, 1567–68

(11th Cir. 1992)).  The goal of such receiverships is to grant fair relief to as many investors as possible.  *See Elliott*, 953 F.2d at 1566.

The appellants in this case are investors who fell victim to a Ponzi scheme orchestrated by James Torchia.  After the Securities and Exchange Commission initiated federal proceedings against Mr. Torchia, the district court appointed a receiver for one of Mr. Torchia's entities.  The receiver proposed a plan to collect and sell assets connected to the scheme and distribute the proceeds.  On appeal, the investors argue that the district court denied them due process by employing summary proceedings that did not allow them to present their claims and defenses or meaningfully challenge the receiver's decisions.  We agree that the summary proceedings here did not afford the investors due process, and reverse and remand for further proceedings.

## I

The S.E.C. filed suit against Mr. Torchia in 2015, alleging that he operated a Ponzi scheme through one of his entities, Credit Nation Capital, LLC.  CN Capital and its investors purchased interests from third parties in life insurance policies, commonly called life settlement policies.  Mr. Torchia, claimed the S.E.C., used another entity, Credit Nation Acceptance, LLC, to sell promissory notes with interests in life insurance policies acquired by CN Capital.  According to the S.E.C., Mr. Torchia commingled funds from CN Acceptance to cover CN Capital's deficits.

In April of 2016, the district court froze CN Capital's assets and appointed a receiver to facilitate the collection, sale, and distribution of assets to repay investors defrauded by Mr. Torchia. The receiver determined that CN Capital had three categories of investors: (1) investors who loaned money to CN Capital in return for a promissory note; (2) investors who purchased life insurance policies in which they were the sole beneficiaries (the "Direct Investors"); and (3) investors who purchased fractional interests in life insurance policies where CN Capital was the beneficiary.

One month later, in May of 2016, the district court ruled that proceeds from the receivership would be distributed *pro rata*—i.e., equally among all investors. The district court also ordered the Direct Investors—who were the sole beneficiaries of one or more insurance policies—to either (a) assign their policies to the receiver (because the policies were serviced with funds comingled from CN Acceptance), or (b) retain their policies provided they "remit to the receiver the value of the benefit they have received from CN Capital," including any so-called "fictitious profits." D.E. 120 at 11. "Fictitious profits" included "the amount of premiums paid by CN Capital to keep the Direct Investors' policies in force, and the fair market value of other services provided to the Direct Investors by CN Capital." *Id.*

## A

Katherine and Richard Sutherland were Direct Investors in CN Capital and the sole beneficiaries of an insurance policy with the face value of $26,992 on the

life of Jimmy Martin.  In June of 2016 and December of 2016, the receiver sent the Sutherlands letters demanding that they either assign the Martin policy to him or remit $25,820.34 in purported fictitious profits.  According to the receiver, the premiums paid by CN Capital on the Martin policy totaled $21,641.71 and the "fair market value of other services" provided by CN Capital was $4,178.63.  The receiver did not explain how he had calculated the "fair market value of other services."  The Sutherlands objected, arguing that their rights were superior to those of the receiver because, as a contractual matter, the money they paid to acquire the Martin policy included payment for the premiums and for CN Capital's servicing of the policy. The receiver responded that he was acting on the district court's earlier order to collect CN Capital's assets.

On February 14, 2017, the receiver moved for an order requiring the Sutherlands to file written objections to the assignment of the Martin policy.  The district court allowed the Sutherlands to file a response to the receiver's motion, and the receiver replied to the Sutherlands' arguments.

As the movant, the receiver had the burden to show that the receivership was entitled to the requested relief.  *See, e.g.*, *Evans v. Robins*, 897 F.2d 966, 968 (8th Cir. 1990).  *Cf. Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2009) (discussing a receiver's burden in recovering false profits); *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 331, 334–35 (Bankr. S.D.N.Y. 2011) (same).  Throughout the process,

7

however, the receiver did not submit any evidence to the district court justifying his determination that the Sutherlands were obligated to remit fictitious profits or supporting his calculations of the fictitious profits. *Cf. Wiand*, 753 F.3d at 1199, 1204 (affirming summary judgment order that allowed the receiver to recover "false profits" where the receiver alleged that the Ponzi scheme paid out investors in excess of their original investment and provided evidence of specific transactions).[1]

The Sutherlands were not permitted discovery on the receiver's determinations and calculations. Nor, as we explain later, were they allowed to fully present their claims or defenses to dispute the receiver's fictitious profits claim.

On July 12, 2017, the district court overruled the objections and ordered the Sutherlands to either remit the fictitious profits claimed by the receiver (i.e., the premiums paid by CN Capital plus the "fair market value of other services") or

---

[1] In an earlier brief to the district court, the receiver cited our opinion in *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011), for the proposition that "[a]ny transfers over and above the amount of the principal [invested in a Ponzi scheme]—i.e., for fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee." D.E. 78 at 3 n.2 (second alteration in original). *See also In re Indep. Clearing House Co.*, 77 B.R. 843, 870 (D. Utah 1987) (outlining the "law allowing a trustee to avoid payments of fictitious Ponzi scheme profits"). Although *Perkins* is generally instructive on a receiver's ability to recover fictitious profits, it does not state or hold that premiums paid on a life insurance policy or "other services" provided in administering such a policy are necessarily fictitious profits. *See Perkins*, 661 F.3d at 626–29. Moreover, *Perkins* does not provide a method for calculating such profits. *See id.* On appeal, the receiver argues that such premiums and "other services" should be considered fictitious profits because CN Capital paid for them using comingled funds. It is not clear on this record, however, whether the receiver provided evidence that CN Capital used comingled funds to pay for the Martin policy's premiums or for "other services" it provided to the Sutherlands. It is similarly unclear whether the Sutherlands had a meaningful opportunity to challenge the receiver's conclusion that they profited from comingled funds. We express no view on these matters, and leave them for determination on remand.

assign the Martin policy to the receiver. The district court did not explain why the receiver's fictitious profits calculations were correct. Shortly thereafter, the Sutherlands assigned the Martin policy to the receiver.

**B**

While the district court was considering the Sutherlands' objections, additional issues arose between the receiver and CN Capital's investors. On April 19, 2017, following Mr. Torchia's consent to a final judgment, the receiver asked the district court to approve his proposed claims process and distribution plan. The receiver's distribution plan, among other things, treated all categories of investors equally and consolidated each investor's multiple claims into a single claim. One group of investors—the O'Dell investors—jointly objected to the proposed distribution plan and the district court's use of summary proceedings related to the receivership.

On July 18, 2017, the district court held a hearing on the receiver's distribution plan, and the O'Dell investors were allowed to present argument at that hearing. The O'Dell investors, however, were not permitted to call witnesses or conduct discovery, and oral argument was limited to objections to the plan's claims and distribution process. On August 7, 2017, the district court overruled the O'Dell investors' objections and approved the receiver's distribution plan.

9

The Sutherlands and the O'Dell investors separately appealed the district court's orders. They contend that that they were denied due process because the district court's summary proceedings did not provide them with a meaningful opportunity to present their claims and defenses or to challenge the receiver's determinations or calculations related to the claimed fictitious profits.

## II

We must first decide whether the district court's July 12, 2017, and August 7, 2017, orders are appealable.  The Sutherlands (who appeal the July 12 order) and the O'Dell investors (who appeal the August 7 order) respectively contend that each order is appealable under 28 U.S.C. § 1292(a)(2), as a receivership order directing the sale or disposal of assets; under 28 U.S.C. § 1292(a)(1), as an injunction or an order continuing an injunction; and under the collateral order doctrine (because each order is final as to issues collateral to the S.E.C. action against Mr. Torchia and will otherwise be unreviewable).

The S.E.C. submits that the July 12 order as to the Sutherlands is appealable under § 1292(a)(1), and that the August 7 order as to the O'Dell investors is appealable under the collateral order doctrine.  The receiver argues that § 1292(a)(1) does not confer appellate jurisdiction over the July 12 order as to the Sutherlands but agrees that the August 7 order as to the O'Dell investors is appealable as a collateral

order.  We agree with the S.E.C.'s jurisdictional position, and conclude that we have appellate jurisdiction.[2]

## A

Under 28 U.S.C. § 1292(a)(1), we have jurisdiction to review certain interlocutory orders, such as those "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  *See Birmingham Fire Fighters Ass'n 117 v. Jefferson Cty.*, 280 F.3d 1289, 1292 (11th Cir. 2002).  "In determining what is an appealable order under [§] 1292(a)(1), courts look not to the terminology, but to the 'substantive effect of the order made.'" *McCoy v. La. State Bd. of Educ.*, 345 F.2d 720, 721 (5th Cir. 1965) (citation omitted).

The district court's July 12 order requiring the Sutherlands to either remit the purported fictitious profits or assign the Martin policy to the receiver, consistent with its prior order stating that all Direct Investors must remit fictitious profits or assign their policies, is an order "granting [or] continuing . . . [an] injunction" under § 1292(a)(1).  It "command[s] . . . an action," Black's Law Dictionary 904 (10th ed. 2014), concerning the merits of the relief requested by the receiver.  *See Yeargin Constr. Co. v. Parsons & Whittemore Ala. Mech. & Servs. Corp.*, 609 F.2d 829, 831 (5th Cir. 1980) (reviewing a district court's order requiring a party to turn over records under § 1292(a)(1)); *Laje v. R.E. Thompson Gen. Hosp.*, 564 F.2d 1159,

---

[2] Given our resolution, we do not address whether either order is appealable under § 1292(a)(2).

1161 (5th Cir. 1977) (concluding that an order directing a hospital to grant a doctor staff privileges "was in the nature of an injunction" and appealable under § 1292(a)(1)).  *See also* 17 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3922 (3rd ed. 2013) (explaining that an injunction for purposes of § 1292(a)(1) is an order "directed to a party, enforceable by contempt, and designed to accord or protect 'some or all of the substantive relief sought by a complaint' in a more than temporary fashion") (footnotes omitted).  The receiver presents no cases or authorities to the contrary.  *Cf. Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010) (describing certain orders that are appealable under § 1292(a)(1)).

The receiver does argue that, even if the July 12 order is appealable under § 1292(a)(1), the appeal is moot because the Sutherlands complied with the order by assigning the Martin policy to him.  We disagree.  "[A] case becomes moot only when it is impossible for a court to grant effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation and internal quotation marks omitted).  If the Sutherlands are ultimately successful, the district court could award them monetary relief to compensate them for the loss of the Martin policy. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam) ("[T]he availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'") (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).  *See also In*

*re Transwest Resort Props., Inc.*, 801 F.3d 1161, 1172–73 (9th Cir. 2015) (citing the possibility of similar "partial relief" in a bankruptcy appeal); *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (same).

**B**

The district court's August 17 order approved the receiver's claims process and distribution plan.   We reviewed a similar order approving a receiver's distribution plan in *Elliott*, 953 F.2d at 1566, but we did not address the jurisdictional issue in that case, and "we are not bound by a prior decision's sub silentio treatment of a jurisdictional question."   *Okongwu v. Reno*, 229 F.3d 1327, 1330 (11th Cir. 2000).   We now conclude that the August 12 order is appealable under the collateral order doctrine.

Although we have not explicitly applied the collateral order doctrine to confer appellate jurisdiction over an order approving a receiver's distribution plan, at least three other circuits have.   *See S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 330–31 (7th Cir. 2010); *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330–31 (5th Cir 2001); *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 666–67 (6th Cir. 2001).   *Cf. S.E.C. v. Capital Consultants LLC*, 453 F.3d 1166, 1171–72 (9th Cir. 2006) (concluding that investors' claims to assets held by a receiver was not collateral to the merits of the action).   We agree with our sister circuits, and hold that

the district court's order approving the receiver's distribution plan is appealable as a collateral order.

Under the collateral order doctrine, we have jurisdiction to review a district court order that (1) conclusively determines the question in dispute, (2) resolves an important issue completely separate from and collateral to the merits of the action, and (3) would effectively be unreviewable on appeal from the final judgment. *See Plaintiff A v. Schair*, 744 F.3d 1247, 1252–53 (11th Cir. 2014) (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). As the Fifth Circuit persuasively explained in *Forex*, 242 F.3d at 330:

> The decision by the district court to approve the [r]eceiver's distribution plan fits within the confines of the collateral order doctrine. First, it conclusively determines the manner in which the receivership assets should be distributed. Second, it resolves an important issue regarding distribution of the assets, which is separate from the merits of the SEC's complaint against [the defendant]. Third, it is effectively unreviewable on appeal because the assets from the receivership will be distributed, and likely unrecoverable, long before the action brought by the SEC is subject to appellate review.

In sum, the district court's order approving the receiver's distribution plan is appealable as a collateral order.

## III

A district court has summary jurisdiction over receivership proceedings and may deviate from the Federal Rules of Civil Procedure in favor of exercising its

"broad powers and wide discretion to determine relief[.]" *Elliott*, 953 F.2d at 1566. *See also Capital Consultants, LLC*, 397 F.3d at 738 ("[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.") (quoting *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)). This discretion derives from the district court's inherent equitable powers. *See Elliott*, 953 F.2d at 1566.

We have affirmed the use of so-called summary proceedings to reduce the time necessary to settle disputes, decrease litigation costs, and prevent further dissipation of assets. *See id.* Although the word "summary" connotes an abbreviated procedure, it does not permit the district court to deny the parties due process. *See id.* at 1567. *See also Basic Energy & Affiliated*, 273 F.3d at 668, ("In exercising its equitable discretion . . . the district court must still provide the claimants with due process."). Due process, in its most basic form, still requires notice and an opportunity to be heard. *See* U.S. Const. amend. V; *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976). *See also Elliott*, 953 F.2d at 1566.

To determine whether the district court's summary proceedings provided due process, we "look at the actual substance, not the name or form, of the procedure to see if the [investors'] interests were adequately safeguarded." *Elliott*, 953 F.2d at 1567. Summary proceedings generally afford due process, and the district court does not abuse its discretion, so long as the investors are permitted "to present evidence

15

when the facts are in dispute and to make arguments regarding those facts." *Id*. On the other hand, such proceedings are inadequate "when [the investors are] deprived of a full and fair opportunity to present their claims and defenses." *Id*.

## A

In *Elliot*, we considered whether a district court's use of summary proceedings in a receivership violated the investors' due process rights. *See id.* at 1566–67. We concluded that the district court's summary proceedings were sufficient as to some investors but insufficient as to others. *See id.* at 1567–76.

First, we vacated the setting aside of a transfer from Mr. Elliot—the defendant—to two investors because the district court used inadequate summary proceedings to conclude that the transfer was fraudulent. *See id.* at 1567–68. Specifically, we ruled that the summary proceedings—which allowed the investors to fill out written forms with their objections—were insufficient because determining whether the transfer was fraudulent "required an evidentiary hearing" where the investors could "present and argue their facts." *Id.* at 1568.

Second, we concluded that the summary proceedings used by the district court to determine which investors owned particular securities—including the reviewing of loan documents and the parties' briefs—complied with due process. *See id.* at 1569–71. Unlike the circumstances surrounding the allegedly fraudulent transfer, the facts concerning who owned the securities were not in dispute and the investors

16

"failed to show how their rights would have been better protected by fuller proceedings." *Id.* at 1570.

Third, we held that the district court denied due process to one investor by rejecting his claim that he was entitled to setoff his liability to the receivership through a debt the receivership owed him. *See id.* at 1571–75. "[W]ithout permitting [the investor] discovery or an opportunity to present evidence on his claims and defenses," the district court's summary proceedings failed to afford due process because they failed to provide the investor "a meaningful opportunity" to argue and determine that he was entitled to a setoff. *Id.* at 1572, 1575.

The district court in this case did not err by exercising its equitable power to appoint a receiver and utilize certain summary proceedings. *See id.* at 1566. But, as with the investors in *Elliot* challenging a fraudulent transfer claim and asserting a setoff, the summary proceedings used by the district court did not provide the Sutherlands or the O'Dell investors with a meaningful opportunity to challenge the receiver's determinations and calculations or to argue their claims and defenses. *See id.* at 1568, 1575. We explain why below.

**B**

Between January and May of 2016, the district court appointed the receiver, issued an injunction to freeze CN Capital's assets, and held status conferences regarding the receivership. The receiver then separated CN Capital's investors into

17

different categories, and the district court issued an order that called for the receiver to collect and sell the receivership's insurance policies, provided for a *pro rata* distribution, defined fictitious profits, required investors to repay fictitious profits, and allowed the Direct Investors to retain their policies so long as they remitted fictitious profits. These determinations by the receiver and the orders entered by the district court were made without giving the Sutherlands or the O'Dell investors sufficient notice and/or a meaningful opportunity to be heard. Even after the investors were given notice of the receiver's determinations and the district court's orders, the district court continued to use summary proceedings in adjudicating their claims and defenses. For example, as far as we can tell, the district court never expressly addressed the argument of the Sutherlands that their interests were superior to those of the receiver. Instead, it merely pointed to the receiver's conclusion that CN Capital serviced the policies using comingled funds.

In June of 2016, the Sutherlands received notice from the receiver that if they wished to retain the Martin policy, they were required to remit fictitious profits, i.e., the premiums that CN Capital paid on the policy plus the "fair market value of other services" that CN Capital rendered in administering the policy. A later notice informed the Sutherlands that their monetary obligation totaled $25,820.34, including $4,178.63 for "other services" provided. The receiver, however, never provided the Sutherlands—nor filed with the district court—any evidence

18

whatsoever of the premiums CN Capital paid on the policy or the nature of the services CN Capital rendered.  Nor did the receiver set out the methodology for his calculation of "fair market value of other services."  As noted, the district court denied the Sutherlands' requests for discovery.

Viewing the totality of the circumstances, we conclude that the Sutherlands were not provided sufficient process.  *See Elliott*, 953 F.2d at 1566 (noting that "the process that is due varies according to the nature of the right and to the type of proceedings").  Maybe things would have been different had the receiver—the party with the burden of proof—submitted evidence supporting how he arrived at the amount of premiums paid by CN Capital and/or provided his methodology for determining the "fair market value of other services" rendered by CN Capital.  But he did not, and it was therefore improper to require the Sutherlands to object to his conclusory demands while simultaneously denying their request for discovery.  *See Republic Nat. Bank of Dall. v. Crippen*, 224 F.2d 565, 566 (5th Cir. 1955) (holding that the district court erred in refusing to hear the claims of certain creditors in a bankruptcy proceeding, and explaining that "the denial of due process . . . is never harmless error").  *See also Parker v. Williams*, 862 F.2d 1471, 1481–82 (11th Cir. 1989) ("[P]rocedural due process is an absolute right . . . .  Although the result in this case may work a hardship on [a party] with no change in the ultimate result, every party must have the opportunity to participate in the processes which may

affect his or her rights in a significant manner."), *overruled on other grounds by Turquitt v. Jefferson Cty., Ala.*, 137 F.3d 1285 (11th Cir. 1998).[3]

We acknowledge that the Sutherlands were allowed to file written objections to the assignment of the Martin policy or the repayment of fictitious profits. But the Sutherlands were not permitted to substantively challenge the receiver's calculation of fictitious profits, a sum which provided a basis for the assignment of the Martin policy.

Moreover, the district court did not allow the Sutherlands to meaningfully argue certain claims or defenses. For example, the Sutherlands argued that, as a contractual matter, the premiums CN Capital paid to service the Martin policy should not be considered fictitious profits because they entered into an agreement to purchase the Martin policy for $155,000—a sum which included CN Capital's servicing of the policy, the payment of premiums, the tracking and monitoring of the policy, and the filing of an application for benefits upon the insured's death. The district court rejected these arguments, citing a previous order denying the motion by another group of investors to amend the receiver's initial separation of CN Capital's investors and fictitious profits determinations. As discussed in the previous order, the other group of investors asserted *different* challenges related to the receiver's recovery of fictitious profits and focused primarily on the division of

---

[3] Even on appeal the receiver does not provide his methodology or explain his calculations.

20

CN Capital investors into different groups of investors. Because the previous order did not address (and therefore did not foreclose) the arguments made by the Sutherlands, the district court did not provide them with sufficient process.

We express no view as to the validity of the Sutherlands' claims or defenses or as to the receiver's position or methodology. We hold only that due process required the district court to more fully adjudicate the Sutherlands' claims and defenses. *See Elliott*, 953 F.2d at 1568, 1575. *See also Crippen*, 224 F.2d at 566.

## C

In April of 2017, the receiver filed his proposed distribution plan with the district court. The plan set out how the receiver would treat fictitious profits, sell certain assets, and distribute proceeds to investors. Several investors, including the O'Dell investors, objected.

Like the Sutherlands, the O'Dell investors were allowed to file objections to the proposed distribution plan. In addition, the district court heard oral argument on their objections. The district court, however, limited the scope of the objections and the issues at oral argument to the form of the proposed distribution plan. For example, the O'Dell investors argued—similarly to the Sutherlands—that based on the terms of their respective purchase agreements, the receiver should not count as fictitious profits the premiums that CN Capital paid while administering their policies.

21

The district court declined to substantively address the O'Dell investors' arguments related to fictitious profits. This was error. *See Crippen*, 224 F.2d at 566. Due process required the district court to provide the O'Dell investors a meaningful opportunity to object to the receiver's determinations and calculations, present evidence and argue their claims and defenses, and challenge the substance of the receiver's proposed distribution plan. *See Elliot*, 953 F.2d at 1568, 1575.

**D**

The receiver argues that more substantial process was impractical because the receivership was illiquid and could not afford to continue paying the premiums for the insurance policies connected to CN Capital. To an extent, we are sympathetic. We appreciate that, in some cases, the practical realities of a receivership may justify *some* expediency at the expense of *some* procedural formality. That is, after all, the nature of the district court's broad equitable power in receivership. *See Capital Consultants, LLC*, 397 F.3d at 738. In this case, for instance, the receiver needed to quickly collect and sell the policies before they lapsed.

But we reiterate here what we said in *Elliot*, 953 F.2d at 1573: the need for expediency and a district court's authority to utilize summary proceedings in receivership do not outweigh an investor's right to due process. The process due depends on a number of factors, *see Elliott*, 953 F.2d at 1566, but at minimum summary proceedings must provide affected investors with necessary information,

22

a meaningful opportunity to argue the facts and their claims and defenses, and an adjudication of their claims and defenses.  Otherwise, the summary proceedings do not afford due process.  *See id.* at 1568, 1571–72, 1575.  *See also Eldridge*, 424 U.S. at 332–33, 349 (outlining the requirements of due process); *Liberte Capital Grp., LLC v. Capwill*, 421 F.3d 377, 384–85 (6th Cir. 2005) (holding that, under the due process clause, an investor was entitled to a hearing before the court authorized a receiver to seize proceeds from the investor's life settlement policy).

### E

On appeal, both the Sutherlands and the O'Dell investors argue that that they should be allowed discovery to substantiate their objections, claims, and defenses. We decline at this time to mandate such a course on remand.

When the case returns to the district court, the receiver should submit evidence together with a memorandum of law that supports his position that a particular investor must remit fictitious profits.   The receiver should also set out the methodology used to calculate each investor's fictitious profits (including the "fair market value of other services" provided by CN Capital).  Once the receiver does so, the Sutherlands and the O'Dell investors should then be permitted to meaningfully challenge the receiver's legal theories, factual determinations, and mathematical calculations. Once the district court has reviewed the receiver's filings and the submissions from the Sutherlands and the O'Dell investors, it will be in a

better position to determine whether any discovery is warranted. *Elliott*, 953 F.2d at 1570 (stating that additional procedures are not required when the investor "fail[s] to show how their rights would have been better protected by fuller proceedings"). Following briefing (and possibly discovery), the district court must address the substantive arguments made by the Sutherlands and the O'Dell investors, including the contention that their purchase agreements foreclose the receiver's recovery of fictitious profits.

## IV

The summary proceedings in this case provided insufficient process to the Sutherlands and the O'Dell investors. We reverse the July 12 order requiring the Sutherlands to either assign the Martin policy or remit fictitious profits and the August 7 order approving the receiver's distribution plan. We remand the case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**